## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

IRON WORKERS MID-SOUTH PENSION FUND,
Derivatively on Behalf of DISH NETWORK CORPORATION,

Plaintiff,

v.

CHARLES W. ERGEN,
JAMES DEFRANCO,
CANTEY M. ERGEN,
JOSEPH P. CLAYTON,
STEVEN F. GOODBARN,
TOM A. ORTOLF,
DAVID K. MOSKOWITZ, and
CARL E. VOGEL,

Defendants,

- and -

DISH NETWORK CORPORATION, a Nevada corporation,

Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

---

# TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE .....................................................................................4

III.    THE PARTIES...............................................................................................................5

      A.    Plaintiff.................................................................................................................5

      B.    Nominal Defendant .............................................................................................5

      C.    Defendants...........................................................................................................5

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS .......................................................9

      A.    Fiduciary Duties ..................................................................................................9

      B.    Breaches of Duties ............................................................................................10

      C.    Additional Duties of the Audit Committee Defendants ....................................10

V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION...............11

VI.     BACKGROUND OF DEFENDANT ERGEN'S CONTROL OF DISH..........................12

      A.    Historical Development of Dish.........................................................................12

      B.    Dish Concedes that Defendant Ergen Dominates and Controls the Company ........13

      C.    Defendant Ergen's History of Using His Control over Dish to Benefit
           Himself and His Family .............................................................................14

VII.    DEFENDANT ERGEN'S CHALLENGED SELF-DEALING .......................................15

      A.    Defendant Ergen Secretly Purchases LightSquared's Secured Debt........................15

      B.    Defendant Ergen Competes with Dish to Purchase LightSquared's Assets
           out of Bankruptcy....................................................................................18

      C.    Defendant Ergen's Actions Cause LightSquared's Controlling Shareholder
           to File a Lawsuit Against Dish and Jeopardizes Dish's Potential Purchase of
           LightSquared ..........................................................................................20

VIII.   DAMAGES TO DISH ...................................................................................................21

IX.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................22

  A. Demand Is Excused Because Defendants Have the Burden of Proving the Entire Fairness of Defendant Ergen's Self-Dealing at Issue in This Action ............22

  B. Demand Is Excused Because a Majority of the Board Lacks Independence from, and Is Beholden to, Defendant Ergen ..............................................................23

  C. Demand Is Excused Because Defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, Goodbarn, and Ortolf Face a Substantial Likelihood of Liability for Their Misconduct ...........................................................27

X. COUNT I - Against the Individual Defendants for Breach of  Fiduciary Duty ................29

XI. COUNT II - Against the Individual Defendants for Waste of Corporate Assets ..............30

XII. COUNT III - Against the Individual Defendants for Unjust Enrichment .........................30

XIII. PRAYER FOR RELIEF ......................................................................................................31

XIV. JURY DEMAND ................................................................................................................33

Plaintiff Iron Workers Mid-South Pension Fund, by its undersigned counsel, submits this Verified Shareholder Derivative Complaint on behalf of nominal defendant DISH Network Corporation ("Dish" or the "Company") against the defendants named herein.  Plaintiff alleges upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief based upon its attorneys' investigation, which included, but was not limited to, a review of U.S. Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available information regarding the Company, as follows:

## I.   NATURE AND SUMMARY OF THE ACTION

1.   This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Dish against certain of its officers and directors for breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.  Plaintiff brings this action to address the self-dealing by Dish's founder, controlling shareholder, and Chairman of the Board of Directors (the "Board"), defendant Charles W. Ergen ("Ergen").

2.   In May 2012, LightSquared, Inc. ("LightSquared") a broadband network services provider with substantial holdings of valuable spectrum assets, filed for bankruptcy protection. Following the bankruptcy filing, defendant Ergen disregarded that Dish was looking to purchase wireless spectrum and spent approximately *$847 million* to acquire LightSquared's debt with a par value of over *$1 billion* for himself.  As a result of these purchases, defendant Ergen became LightSquared's single largest creditor at a massive discount.  By accumulating this large debt load, defendant Ergen gave himself pole position to acquire LightSquared's valuable spectrum in bankruptcy court, or to be rewarded handsomely if an entity outbid him.  As Chairman and controlling shareholder of Dish, defendant Ergen knew that he could force the Company to make such a bid.

3.     In May 2013, defendant Ergen bid $2 billion to purchase all of LightSquared's assets—including wireless spectrum—while knowing that Dish was in the market to acquire companies with large holdings of spectrum.  By submitting his $2 billion offer defendant Ergen set a "floor" price in any bankruptcy auction.  Given that LightSquared's outstanding secured debt was $1.7 billion, defendant Ergen's $2 billion floor bid prevented anyone, most notably Dish, from bidding for LightSquared's spectrum at anything less than the amount required to repay LightSquared's secured debt holders in full.  Accordingly, defendant Ergen's $2 billion floor effectively guaranteed that defendant Ergen would profit from his investment in LightSquared's debt by as much as *$165 million*.[1]

4.     Purportedly due to defendant Ergen's substantial holdings of LightSquared's debt, the Board formed a two-person special committee (the "Special Committee"), comprised of directors Gary S. Howard ("Howard") and defendant Steven F. Goodbarn ("Goodbarn"), to determine whether Dish would make a competing bid for LightSquared's assets.  Shortly after its creation, the Special Committee recommended and the Board approved of the Company offering *$2.2 billion* for LightSquared's assets, topping defendant Ergen's bid for Dish by $200 million. No other bidder has yet to emerge for LightSquared's assets.  Accordingly, Dish effectively entered into a bidding contest with its own founder, chairman, and controlling shareholder.  This is a blatant breach of defendant Ergen's fiduciary duty of loyalty to the Company.

5.     Further, as would later be revealed, defendant Ergen and his loyalist Board's failed attempt at impartiality and independence by creating the Special Committee was a farce. The Board did not grant the Special Committee any independent authority to ensure a fair result

---

[1] Defendant Ergen paid $847,567,167.30  for debt that had a par value of $1,013,082,326.30.

for the Company and its public shareholders.   In fact, the Board disbanded the Special Committee just prior to the Company's announcement of its $2.2 billion offer, after the Special Committee insisted that it should have an ongoing role in the deal discussions in light of defendant Ergen's conflicting personal interests.   Only two days after Dish made its $2.2 billion bid, Howard, one of the two members of the Special Committee, abruptly resigned from the Board.   Howard expressed concern that Dish's $2.2 billion offer for LightSquared could look bad in the eyes of regulators, given defendant Ergen's personal interests in LightSquared and the Company.   Howard wanted to keep open the possibility that at least some of defendant Ergen's gains would be shared with Dish's public shareholders.   This was unacceptable to defendant Ergen, who had his controlled Board disband the Special Committee.

6.      Defendant Ergen does not face liability for harming the Company alone.   Because defendant Ergen stands on both sides of the LightSquared dealings discussed herein, the Board had a fiduciary obligation to ensure that any transactions which would benefit Ergen were entirely fair to the Company.   As discussed in more detail below, the Individual Defendants (as defined herein) have failed in their duties.   Defendant Ergen's investment in LightSquared's debt, his $2 billion bid for LightSquared, creating an unnecessary "floor" for Dish to meet, and the Company's subsequent $2.2 billion offer to purchase LightSquared benefitted only one person, defendant Ergen, at the expense of the Company.

7.      The Board's decision to acquiesce to defendant Ergen's self-dealing is unsurprising given its history of consenting to transactions that are beneficial to defendant Ergen and his family.   These previous self-dealing transactions include: (i) investing hundreds of thousands of dollars in companies in which defendant Ergen's children hold significant

ownership stakes; and (ii) paying defendant Ergen's wife, defendant Cantey M. Ergen ("C. Ergen"), and their children hundreds of thousands of dollars for purported advising services.

8.      Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company.  Plaintiff on behalf of Dish, seeks judicial relief in the form of money damages and the implementation of greater controls to prevent future one-sided self-dealing, as the Individual Defendants will continue their systematic abuse of power without the Court's intervention.

## II.    JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Dish maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dish, occurred in this District; and (iv) defendants have

received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiff

12.    Plaintiff Iron Workers Mid-South Pension Fund was a shareholder of Dish at the time of the wrongdoing challenged herein, has continuously been a shareholder since that time, and is a current Dish shareholder.  Plaintiff is a citizen of Texas, Louisiana, Oklahoma, and Mississippi.

### B.    Nominal Defendant

13.    Defendant Dish is a Nevada corporation with principal executive offices located at 9601 South Meridian Blvd, Englewood, Colorado.  The Company was founded as EchoStar Corporation ("EchoStar") in 1980 by defendant Ergen, his wife, defendant C. Ergen, and their friend, defendant James DeFranco ("DeFranco"), as a satellite television provider for rural areas. In January 2008, EchoStar officially changed its name to "DISH Network" and formed a technology partnership with the then newly formed "EchoStar Corporation."  Today, Dish provides satellite television services to approximately fourteen million subscribers in the United States and entertainment rentals and sales through Blockbuster, Inc., which it purchased in April 2011.  Beginning in 2008, Dish has been acquiring wireless spectrum, including spectrum acquired as part of its purchase of DBSD North America, Inc. ("DBSD") and the assets of TerreStar Networks, Inc. ("TerreStar") in March 2012.

### C.    Defendants

14.    Defendant Ergen is Dish's Executive Chairman and has been since June 2011, and has served as the Company's Chairman of Board and a director since he co-founded the Company with defendants C. Ergen and DeFranco in 1980.  Defendant Ergen was also Dish's

Chief Executive Officer ("CEO") from December 1980 to June 2011, and has held various other executive officer and director positions with Dish and its subsidiaries in the past five years. Defendant Ergen is EchoStar's Chairman of the Board and has been since October 2007. Defendant Ergen was also EchoStar's CEO from October 2007 to November 2009 and EchoStar's President from June 2008 to November 2009.   Defendant Ergen knowingly or recklessly caused the Company to overpay for LightSquared by setting a $2 billion floor for the company and approving Dish's $2.2 billion offer to purchase LightSquared.   Dish paid defendant Ergen the following compensation as an executive:

| Year | Salary | All Other Compensation | Total |
|------|--------|------------------------|-------|
| 2012 | $900,000 | $400,186 | $1,300,186 |

Defendant Ergen is a citizen of Colorado.

15.    Defendant DeFranco is a Dish Executive Vice President and a director and has been since he co-founded the Company with defendants Ergen and C. Ergen in 1980.  During the past five years, defendant DeFranco has also held various other executive officer and director positions with Dish and its subsidiaries.   Defendant DeFranco knowingly or recklessly: (i) acquiesced to defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii) approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt. Defendant DeFranco is a citizen of Colorado.

16.    Defendant C. Ergen is a Dish director and has been since May 2001 and also currently serves Dish as a Senior Advisor.  Defendant C. Ergen co-founded the Company with defendants Ergen and DeFranco in 1980, and has had a variety of operational responsibilities with Dish since its formation.  Defendant C. Ergen knowingly or recklessly: (i) acquiesced to

defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii) approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt.  Defendant C. Ergen is a citizen of Colorado.

17.     Defendant Joseph P. Clayton ("Clayton") is Dish's President, CEO, and a director and has been since June 2011.  Defendant Clayton was also a director at EchoStar from October 2008 to June 2011.  Defendant Clayton knowingly or recklessly: (i) acquiesced to defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii) approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt.  Dish paid defendant Clayton the following compensation as an executive:

| Year | Salary | All Other Compensation | Total |
|------|--------|------------------------|-------|
| 2012 | $900,000 | $7,000 | $907,000 |

Defendant Clayton is a citizen of Colorado.

18.     Defendant Goodbarn is a Dish director and has been since December 2002. Defendant Goodbarn is also a member of Dish's Audit Committee and has been since December 2002.  Defendant Goodbarn was a member of the Special Committee formed to evaluate the acquisition of LightSquared.  Defendant Goodbarn knowingly or recklessly: (i) acquiesced to defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii) approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt.  Dish paid defendant

Goodbarn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2012 | $73,000 | $47,936 | $120,936 |

Defendant Goodbarn is a citizen of Colorado.

19.     Defendant Tom A. Ortolf ("Ortolf") is a Dish director and has been since May 2005.  Defendant Ortolf is also a member of Dish's Audit Committee and has been since May 2005.  Defendant Ortolf was Dish's President and Chief Operating Officer from 1988 to 1991. Defendant Ortolf is an EchoStar director and has been since October 2007.  Defendant Ortolf knowingly or recklessly: (i) acquiesced to defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii) approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt.  Dish paid defendant Ortolf the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $72,500 | $47,936 | $3,902 | $124,338 |

Defendant Ortolf is a citizen of Colorado.

20.     Defendant David K. Moskowitz ("Moskowitz") is a Dish director and has been since 1998 and also currently serves Dish as a Senior Advisor.  Defendant Moskowitz was Dish's General Counsel and Secretary from at least July 1996 to 2007; Executive Vice President from at least September 2004 to 2007; and Senior Vice President from at least July 1996 to about September 2004.  Defendant Moskowitz was also a director at EchoStar from October 2007 to May 2012.  Defendant Moskowitz knowingly or recklessly: (i) acquiesced to defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii)

approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt. Defendant Moskowitz is a citizen of Colorado.

21.     Defendant Carl E. Vogel ("Vogel") is a Dish director and has been since May 2005 and also currently serves Dish as a Senior Advisor. Defendant Vogel was also Dish's Vice Chairman from June 2005 to March 2009; President from September 2006 to February 2008 and from 1995 to 1997; and served the Company under various executive positions from 1994 to 1997. Defendant Vogel was also an EchoStar Senior Advisor and Vice-Chairman of EchoStar's Board from October 2007 to March 2009. Defendant Vogel knowingly or recklessly: (i) acquiesced to defendant Ergen's self-serving scheme to purchase over $1 billion worth of LightSquared's debt at a discount; (ii) allowed defendant Ergen to set a $2 billion floor for the value of LightSquared; and (iii) approved Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt. Defendant Vogel is a citizen of Colorado.

22.     The defendants identified in ¶¶18-19 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶14-21 are referred to herein as the "Individual Defendants."

IV.    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

A.    **Fiduciary Duties**

23.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Dish and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dish in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dish and not in furtherance of their

personal interest or benefit.

24.     To discharge their duties, the officers and directors of Dish were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Dish were required to avoid engaging in, approving, or permitting self-dealing at the expense of the Company.

**B.      Breaches of Duties**

25.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Dish, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

26.     The Individual Defendants breached their duty of loyalty and good faith by engaging in, or allowing others to engage in, self-dealing at the expense of the Company.

27.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Dish, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

**C.      Additional Duties of the Audit Committee Defendants**

28.     In addition to these duties, under the Audit Committee Charter in effect since at least May 2009, the Audit Committee Defendants, defendants Goodbarn and Ortolf, owed specific duties to Dish to assist the Board in overseeing the Company's operations.  Moreover, the Audit Committee's Charter provides that defendants Goodbarn and Ortolf were required to ensure that the Company had an adequate system of internal controls to monitor and avoid self-

dealing.

## V.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

29.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

30.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) facilitate defendant Ergen's self-dealing; and (ii) enhance the Individual Defendants' executive and directorial positions at Dish, and the profits, power, and prestige that they enjoyed as a result of holding these positions.

31.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

32.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by acquiescing to defendant Ergen's self-dealing and consenting to transactions that were beneficial to defendant Ergen but detrimental to Dish. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

33.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.    BACKGROUND OF DEFENDANT ERGEN'S CONTROL OF DISH

### A.    Historical Development of Dish

34.    Dish is the United States' third largest pay-tv provider, providing direct broadcast satellite service—including satellite television, audio programming, and interactive television services to approximately fourteen million subscribers in the United States.

35.    The modern day Dish has its roots in a company called EchoStar. In 1980, defendant Ergen founded EchoStar with his wife, defendant C. Ergen, and his close friend, defendant DeFranco. Fifteen years later, in June 1995, EchoStar had its initial public offering ("IPO") and completed an offering of its Class A common stock for $17 per share. EchoStar's IPO resulted in net proceeds of approximately $63 million. Although defendant Ergen owned 73.6% of the total equity securities of EchoStar at the time of the IPO (assuming exercise of employee stock options), he possessed approximately **96.1%** of the total voting power.

36.    On December 28, 1995, defendant Ergen directed the launching of EchoStar's first satellite, EchoStar I, from Xichang, China. This allowed EchoStar to provide its own Direct Broadcast Satellite ("DBS") service, which began three months later. EchoStar began using "DISH Network" as its consumer brand in March 1996, shortly after the launch of EchoStar.

37.    In January 2008, Dish was spun-off from EchoStar. After the spin-off, Dish was tasked with providing subscription satellite TV service, while EchoStar handled operating the technology and infrastructure, including the satellites, which Dish utilized to provide its services.

38.    At the time of the spin off transaction, defendant Ergen beneficially owned approximately 50% of the total equity and approximately *80%* of the total voting power of both EchoStar and Dish.  Thus, at the time of the spin off, defendant Ergen had the ability to elect a majority of EchoStar and Dish's directors and to control all other matters requiring the approval of EchoStar and Dish shareholders.  Given this power, it is unsurprising that defendant Ergen appointed many of the same directors to the Boards of both EchoStar and Dish, including defendants Clayton, Ortolf, Moskowitz, and Vogel.

39.    Pursuant to the spin off, defendant Ergen became the Chairman and CEO of EchoStar as well as Chairman, CEO, and President of Dish.  Defendant Ergen served as Chairman of the Board and CEO of EchoStar until November 2009, when he resigned from the position of CEO.  Defendant Ergen served as the CEO and President of Dish until June 2011.  Today he serves as Chairman of both EchoStar and Dish.

**B.    Dish Concedes that Defendant Ergen Dominates and Controls the Company**

40.    Even as the Company continued to grow, defendant Ergen maintained his control over Dish.  The current eight-member Board includes defendant Ergen, his wife, his close friend and business partner of over thirty years, and numerous current and former Dish executives who are beholden to defendant Ergen.

41.    The Company concedes defendant Ergen's control in its public filings.  For example, the Company in its annual report filed on Form 10-K with the SEC on February 20, 2013, explains that Dish is a "controlled company" and that defendant Ergen "has the ability to elect a majority of [the Company's] directors and to control all other matters requiring the approval of [the Company's] stockholders."  The Form 10-K states, in pertinent part:

> Through his voting power, *Mr. Ergen has the ability to elect a majority of our directors and to control all other matters requiring the approval of our stockholders*.  As a result, *DISH Network is a "controlled company"* as defined

in the Nasdaq listing rules and is, therefore, not subject to Nasdaq requirements that would otherwise require us to have: (i) a majority of independent directors; (ii) a nominating committee composed solely of independent directors; (iii) compensation of our executive officers determined by a majority of the independent directors or a compensation committee composed solely of independent directors; and (iv) director nominees selected, or recommended for the Board's selection, either by a majority of the independent directors or a nominating committee composed solely of independent directors.

42.     Similarly, the Board in the Company's proxy statement filed with the SEC on March 22, 2013, reiterates that Dish is a "controlled company."  The proxy statement further explains that defendant Ergen "beneficially owns approximately 52.1% of [the Company's] total equity securities and possesses approximately 88.0% of the [Company's] total voting power." The proxy statement states, in pertinent part:

> *We are a "controlled company"* within the meaning of the NASDAQ Marketplace Rules because *more than 50% of our voting power is held by Charles W. Ergen*, our Chairman. *Mr. Ergen beneficially owns approximately 52.1 % of our total equity securities and possesses approximately 88.0% of the total voting power*.

### C.     Defendant Ergen's History of Using His Control over Dish to Benefit Himself and His Family

43.     Defendant Ergen's control over the Company and the Board is highlighted by the numerous transactions he has caused Dish to enter into with members of his family.  For example, in 2012, Dish invested $500,000 in Yottabytes Ventures LLC ("Yottabytes"), a technology startup in which defendant Ergen's son, Christopher Ergen, holds a significant ownership stake.  In addition, Dish currently reserves the right to invest an additional $300,000 in Yottabytes.

44.     Similarly, in 2011, Dish paid $100,000 to an online marketing company that is 50% owned by another one of defendant Ergen's children, Chase Ergen.  In addition to the online marketing deal, Dish also entered into reseller agreements with a separate firm wholly owned by Chase Ergen, paying a total of $101,000 to the company in 2010 and 2011.

45.     Moreover, from 2010 to 2012, Dish paid defendant C. Ergen, defendant Ergen's wife, $100,000 to $110,000 annually to serve as an advisor to the Company.  Certain unnamed Ergen children also collected an estimated $25,000 in 2011 and 2012, and can expect to do so again in 2013.

46.     These family-related transactions raised red flags with shareholder advocates. Lev Janashvili ("Janashvili"), managing director at GMI Ratings, which tracks governance, accounting, and other risks in publicly traded companies, stated that "These are things to be concerned about because they raise reasonable questions about conflicts of interest and the overall integrity of governance at the [C]ompany."  Janashvili further explained that "The investment in Yottabytes Ventures LLC is a classic example of (a related party transaction) that warrants a closer scrutiny of the [C]ompany's governance practices, especially because this transaction is part of a broader pattern of behaviors that run counter to the interests of shareholders."

## VII.   DEFENDANT ERGEN'S CHALLENGED SELF-DEALING

### A.     Defendant Ergen Secretly Purchases LightSquared's Secured Debt

47.     LightSquared is a wireless company focused on developing a nationwide, fourth generation wireless high-speed data communication networks for mobile phones and data terminals.  LightSquared owned large amounts of wireless spectrum in the "L-Band" that it intended to use to wirelessly transmit data.  According to an analyst at CRT Capital Group, this spectrum, if made marketable, could be worth "in excess of *$10 billion*."

48.     Despite its valuable spectrum assets, LightSquared filed for Chapter 11 bankruptcy protection in May 2012 because it could not renegotiate the terms of its $1.7 billion debt due to the regulatory issues it was experiencing with the Federal Communications Commission (the "FCC").  In particular, LightSquared's wireless network interfered with

adjacent spectrum that is used for global positioning system ("GPS") signals.  Federal regulators raised a concern that LightSquared's signal renders GPS devices unusable.  Just prior to filing for bankruptcy, in February 2012, the FCC announced that it intended to suspend LightSquared's wireless spectrum license until its conflicts with GPS were resolved.  LightSquared listed $4.48 billion in assets and $2.29 billion in liabilities in its Chapter 11 petition.

49.     Rather than reserving the opportunity acquiring LightSquared's wireless spectrum assets for Dish, defendant Ergen concocted a plan to ensure that he made nearly $200 million from LightSquared's bankruptcy.  First, defendant Ergen created an investment vehicle named SP Special Opportunities, LLC ("SP") to purchase LightSquared debt for himself.  Defendant Ergen spent approximately $847 million acquiring LightSquared's debt with a par value of over *$1 billion*, thereby becoming LightSquared's single largest secured creditor.  Defendant Ergen purchased LightSquared debt at an average price of *$0.84* on the dollar, including some transactions as low as *$0.44* on the dollar.  Defendant Ergen's debt purchases were as follows:

| Trade Date | Closing Date | Par Value of Purchase | Trading Price of LightSquared Debt at Time of Trade (% of par) | Market Value of Purchase at Time of Trade |
|---|---|---|---|---|
| 4/13/2012 | 9/6/2012 | $5,000,000.00 | $48.75 | $2,437,500.00 |
| 5/3/2012 | 7/23/2012 | 4,545,500.00 | 44.00 | 2,000,020.00 |
| 5/3/2012 | 7/26/2012 | 20,000,000.00 | 44.00 | 8,800,000.00 |
| 5/3/2012 | 9/6/2012 | 3,000,000.00 | 44.00 | 1,320,000.00 |
| 5/3/2012 | 9/6/2012 | 2,000,000.00 | 44.00 | 888,000.00 |
| 5/3/2012 | 7/23/2012 | 5,000,000.00 | 44.00 | 2,200,000.00 |
| 5/4/2012 | 5/31/2012 | 247,259,046.62 | 59.00 | 145,882,837.51 |
| 10/4/2012 | 11/30/2012 | 19,417,287.99 | 74.50 | 14,465,879.55 |
| 10/23/2012 | 2/6/2013 | 3,000,000.00 | 84.50 | 2,535,000.00 |
| 11/15/2012 | 1/8/2013 | 7,997,057.00 | 84.50 | 6,757,513.17 |
| 12/12/2012 | 6/11/2013 | 2,000,000.00 | 84.50 | 1,690,000.00 |
| 12/13/2012 | 3/12/2013 | 7,000,000.00 | 84.50 | 5,915,000.00 |
| 12/20/2012 | 4/9/2013 | 14,782,302.32 | 88.50 | 13,082,337.55 |
| 12/28/2012 | 3/13/2013 | 15,000,000.00 | 88.50 | 13,275,000.00 |

| 1/2/2013 | 3/7/2013 | 20,000,000.00 | 100.50 | 20,100,000.00 |
| 1/2/2013 | 4/5/2013 | 6,000,000.00 | 100.50 | 6,030,000.00 |
| 1/3/2013 | 3/7/2013 | 17,999,999.97 | 100.50 | 18,089,999.97 |
| 1/7/2013 | 5/24/2013 | 7,000,000.00 | 88.00 | 6,160,000.00 |
| 1/14/2013 | 5/24/2013 | 9,410,420.00 | 90.00 | 8,469,378.00 |
| 2/1/2013 | - | 20,000,000.00 | 91.50 | 18,300,000.00 |
| 3/25/2013 | 5/24/2013 | 88,262,536.00 | 94.00 | 82,966,783.84 |
| 3/28/2013 | - | 168,759,227.85 | 91.50 | 154,414,693.48 |
| 4/1/2013 | 6/25/2013 | 5,500,000.00 | 100.00 | 5,500,000.00 |
| 4/19/2013 | 6/14/2013 | 122,250,172.79 | 97.50 | 119,193,918.47 |
| 4/26/2013 | 6/18/2013 | 145,712,408.57 | 97.50 | 142,069,598.36 |
| 4/26/2013 | 6/18/2013 | 46,186,366.57 | 97.50 | 45,031,707.41 |
| **Totals** | | **1,013,082,326.30** | | **847,567,167.30** |

50.     Defendant Ergen knew that Dish was in the market to purchase wireless spectrum at the time he invested into LightSquared.  To start, Dish has spent nearly *$4 billion* since 2007 gathering frequencies for future wireless video and data services.  For example, in 2008, Dish spent *$712* million to acquire 700 MHz wireless spectrum licenses.  In March 2012, Dish spent an additional *$2.86 billion* to complete acquisitions in bankruptcy of 100% of the equity of DBSD and substantially all of the assets of TerreStar, pursuant to which Dish acquired forty MHz of two GHz wireless spectrum licenses.  The forty MHz of frequencies Dish acquired by buying TerreStar and DBSD out of bankruptcy is one of the largest unused swaths of spectrum suitable for broadband.  Next, in 2013, the Company unsuccessfully attempted to merge with Sprint Nextel Corp. and acquire Clearwire Corp., both holders of a substantial amount of wireless spectrum.

51.     In addition to the above, defendant Ergen explained in an interview at the *D: Dive Into Media Conference* in February 2013 that Dish needed more spectrum.  Defendant Ergen stated:

> Ideally, we'd compete against the AT&Ts and Verizons…. To do that, we'd need more spectrum.

**B.**   **Defendant Ergen Competes with Dish to Purchase LightSquared's Assets out of Bankruptcy**

52.     On May 15, 2013, defendant Ergen, through an entity named L-Band Acquisition, LLC ("L-Band"), made an offer for substantially all of the assets of LightSquared for $2 billion in cash.  By submitting his $2 billion offer, defendant Ergen set a floor price in any bankruptcy auction for LightSquared's assets.  Defendant Ergen knew that Dish would be interested in acquiring LightSquared's assets and this floor ensured that his previous $847 million investment in LightSquared's debt securities was protected and that he, as a secured debt holder, would be paid in full.  In fact, with $1.7 billion in total LightSquared outstanding secured debt, defendant Ergen's $2 billion floor effectively guaranteed that defendant Ergen would profit from his investment by as much as *$165 million* if anyone bid more than him.

53.     At the time defendant Ergen bid for LightSquared's assets, Dish was also looking to acquire wireless spectrum.  Due to defendant Ergen's substantial holdings of LightSquared's debt, the Board formed the Special Committee, comprised of directors Howard and defendant Goodbarn, to determine whether Dish would make a competing bid for LightSquared's assets.  Shortly after its creation, the Special Committee purportedly recommended and the Board approved the Company offering $2.2 billion for LightSquared's assets.

54.     On July 23, 2013, a group of LightSquared's secured creditors including defendant Ergen submitted a bankruptcy plan that, if approved, will result in the sale of LightSquared's assets in a public auction. In connection with LightSquared's secured creditors' plan, Dish submitted a "stalking horse agreement" whereby L-Band, now acting on behalf of

Dish, would acquire substantially all of LightSquared's assets for approximately $2.2 billion in cash and the assumption of certain obligations.[2]

55.     That same day, on July 23, 2013, the Company filed a Form 8-K with the SEC disclosing Dish's $2.2 billion offer.  The Form 8-K did not disclose such basic information as who was on the Special Committee, the Special Committee's mandate, the substance of the Special Committee's conclusions, defendant Ergen's involvement with the Special Committee and its deliberations, and the identity of the Special Committee's advisors.  Moreover, the Form 8-K did not disclose that only two days earlier, on July 21, 2013, the Board had disbanded the Special Committee after the Special Committee insisted that it should have an ongoing role in the deal discussions to avoid potential conflicts of interests with defendant Ergen.  Rather, the Form 8-K stated, in part:

> DISH's Board of Directors (the "Board") approved entering into the [agreement] based, among other things, on the recommendation of a special committee of the Board (the "Special Committee") and a fairness opinion that was prepared by a financial advisory firm at the request of the Special Committee.

56.     On July 25, 2013, only two days after Dish made its $2.2 billion bid, Howard, one of the two members of the Special Committee, abruptly resigned from the Board.  Prior to his resignation, Howard had served on the Board for eight years.  Howard reportedly expressed concern that Dish's $2.2 billion offer for LightSquared could look bad in the eyes of regulators, given defendant Ergen's personal interest in the Company, and wanted to keep open the possibility that at least some of defendant Ergen's gains would be shared with Dish's public shareholders.

---

[2] A "stalking horse agreement" is an attempt by a debtor to test the market in advance of an auction.  The intent is to maximize the value of its assets as part of (or before) a court auction in case of bankruptcy.

**C.** **Defendant Ergen's Actions Cause LightSquared's Controlling Shareholder to File a Lawsuit Against Dish and Jeopardizes Dish's Potential Purchase of LightSquared**

57.    On August 6, 2013, Harbinger Capital Partners ("Harbinger"), LightSquared's controlling shareholder, filed a complaint against Dish and defendant Ergen, seeking *$2 billion* in compensation and *$2 billion* in punitive damages.  Harbinger accuses defendant Ergen of engaging in fraudulent behavior in his purchase of LightSquared's debt and subsequent bid to acquire LightSquared's assets out of bankruptcy.  Regardless of whether Harbinger's allegations are correct, defendant Ergen's breaches of fiduciary duty have forced Dish into paying for the defense in Harbinger's lawsuit and create uncertainties regarding whether Dish will be able to purchase LightSquared's spectrum at any price.

58.    As Harbinger notes, defendant Ergen has used similar tactics in the past to gain control of radio spectrum.  The Second Circuit Court of Appeals penalized Dish by stripping it of any voting rights in the bankruptcy of DBSD after a judge held that Dish had improperly purchased $150 million in debt in order to block the satellite broadcaster's plan of reorganization and gain control over its frequencies.  In a 2011 decision, the appeals court upheld the bankruptcy judge's decision that Dish failed to act in good faith when it paid full price for $40 million in first-lien DBSD debt, plus $111 million in lower-ranking bonds, after DBSD had entered bankruptcy.

59.    On August 22, 2013, LightSquared filed a notice of intent to intervene as a plaintiff in the Harbinger action.  Specifically, LightSquared joins the Harbinger action to challenge whether SP, defendant Ergen's hedge fund, legitimately purchased over $1 billion worth of LightSquared's debt.

- 20 -

60.     That same day, on August 22, 2013, a group of secured lenders, including Capital Research and Management, Cyrus Capital Partners, and other funds holding approximately $1.4 billion in claims against LightSquared, also joined Harbinger's lawsuit.

61.     On August 30, 2013, Harbinger filed its own reorganization plan proposing to pay off all creditors through the distribution of cash and new secured notes without selling LightSquared's spectrum assets.

62.     The appearance of impropriety as a result of defendant Ergen's challenged self-dealing transactions has put Dish's potential opportunity to purchase LightSquared and its wireless spectrum in jeopardy.   The bankruptcy court overseeing LightSquared's Chapter 11 petition may now penalize Dish, as it has done so in the past relating to the DBSD bankruptcy, for defendant Ergen's misconduct.

## VIII.   DAMAGES TO DISH

63.     As a result of the Individual Defendants' improprieties, Dish is forced to pay above Ergen's bid to purchase LightSquared's spectrum.   Moreover, as discussed above, defendant Ergen's misconduct has jeopardized the Company's potential acquisition of LightSquared.   As a direct and proximate result of the Individual Defendants' actions, Dish has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending Dish and certain officers and directors in Harbinger's lawsuit; and

(b)     costs incurred from paying any potential settlement or adverse judgment in Harbinger's lawsuit, which is seeking $4 billion in damages.

64.    In addition, defendant Ergen's history of using Dish to accomplish his own goals (and those of his family) rather than maximizing value for the Company and its shareholders has damaged Dish's corporate image and goodwill.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

65.    Plaintiff brings this action derivatively in the right and for the benefit of Dish to redress injuries suffered, and to be suffered, by Dish as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Dish is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

66.    Plaintiff will adequately and fairly represent the interests of Dish in enforcing and prosecuting its rights.

67.    Plaintiff was a shareholder of Dish at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Dish shareholder.

68.    The current Board of Dish consists of the following eight directors: defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, Goodbarn, and Ortolf.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.    Demand Is Excused Because Defendants Have the Burden of Proving the Entire Fairness of Defendant Ergen's Self-Dealing at Issue in This Action

69.    The directors' fiduciary duty requires the exercise of utmost good faith, fair dealing, disclosure, and avoiding even the impropriety of self-interest or self-dealing.   As discussed in more detail herein, defendant Ergen stands on both sides of the potential Dish acquisition of LightSquared at issue in this action.  Defendant Ergen will receive certain benefits

not shared by the Company's outside shareholders if Dish acquires LightSquared's assets because defendant Ergen is LightSquared's largest creditor.  As stated above, defendant Ergen bought a substantial amount of the Company's debt at a significant discount.  Defendant Ergen knew that Dish would want to acquire LightSquared, which ensured that his previous investment in LightSquared's debt securities was protected.  Moreover, defendant Ergen is now causing Dish to acquire LightSquared for $2.2 billion, which guarantees a handsome profit of as much as ***$165 million*** for defendant Ergen.

70.    Since defendant Ergen stands on both sides of the challenged transaction, Dish's proposed acquisition of LightSquared is subject to the rigorous judicial scrutiny of the entire fairness standard.  Because entire fairness is the standard of review, the challenged self-dealing is not protected by the business judgment rule.  Rather, the burden of proving the inherent or entire fairness of the LightSquared transactions challenged herein, including all aspects of these transactions' negotiation, structure, and terms, is placed upon the Board, as a matter of law. Since the business judgment rule does not apply and the Court must review this matter under the entire fairness standard, demand is excused.

**B.    Demand Is Excused Because a Majority of the Board Lacks Independence from, and Is Beholden to, Defendant Ergen**

71.    Demand is excused because a majority of the Board is not independent from defendant Ergen, the primary beneficiary of the wrongdoing at issue in this action.  Defendant Ergen is conflicted with respect to determining whether to initiate and aggressively prosecute this action because pursuing the claims asserted herein could force defendant Ergen to disgorge the profits from his LightSquared debt purchases and he faces liability for engaging in the self-dealing transactions described herein.

72.     Defendant Ergen has concentrated the control over the Company in his hands.  As the Company discloses in its financial filings, Dish is a "controlled company" and defendant Ergen "has the ability to elect a majority of our directors and to control all other matters requiring the approval of our stockholders."  Defendant Ergen is the Company's controlling shareholder, owning over 52% of the Company's total equity securities and possessing approximately *88%* of the Company's total voting power.

73.     Further, the Board's history shows that it will defer to defendant Ergen and act for his benefit rather than Dish's public shareholders.  As detailed above, the Board approved numerous self-serving measures in the past just to please defendant Ergen.  These measures included: (i) investing hundreds of thousands of dollars in companies defendant Ergen's children hold significant ownership stakes in; and (ii) paying defendant C. Ergen, defendant Ergen's wife, and defendant Ergen's children hundreds of thousands of dollars for purported advising services.

74.     Similarly, defendant Ergen used his control over EchoStar's Board, which included overlapping Board members defendants Clayton, Ortolf, and Moskowitz, to cause EchoStar to improperly grant him 1.5 million stock options to purchase its publicly-traded Class A common stock.  The stock options were granted under EchoStar's shareholder-approved Amended and Restated EchoStar Corporation 2008 Stock Incentive Plan ("Incentive Plan") and were valued at approximately *$21.6 million*.  In granting defendant Ergen the 1.5 million stock options, EchoStar's Board exceeded its authority under the Incentive Plan, which limited the amount of awards that could be granted to any individual to 800,000 shares for any calendar year.  Accordingly, the 700,000 stock options granted to defendant Ergen in excess of the 800,000 limit were *ultra vires*.

75.     Defendant C. Ergen is not independent of defendant Ergen because she is his wife and stands to benefit from hundreds of millions of dollars in potential profits on defendant Ergen's improper LightSquared debt purchases.  As such, defendant C. Ergen lacks the adequate independence necessary to prosecute a suit against defendant Ergen, rendering any demand upon defendant C. Ergen futile.

76.     Defendant DeFranco is not independent of defendant Ergen due to his significant personal and business ties to defendant Ergen.   Defendant DeFranco has been friends with defendant Ergen for over thirty years, since the men were professional gamblers in Las Vegas, Nevada.   Moreover, defendant DeFranco co-founded the Company with defendant Ergen and thus owes his financial success in large part, to defendant Ergen.  As such, defendant DeFranco lacks the adequate independence necessary to prosecute a suit against defendant Ergen, rendering any demand upon defendant DeFranco futile.

77.     Defendant Clayton is not independent of defendant Ergen because he owes his livelihood to defendant Ergen.  In addition to serving on the Board, defendant Clayton is Dish's President and CEO.   Defendant Ergen personally selected defendant Clayton to succeed him after he resigned from being the Company's CEO in 2011.   Defendant Clayton received total compensation of $907,000 and $9,845,632 in 2012 and 2011, respectively.   As the controlling shareholder of the Company, defendant Ergen can force the Board to fire defendant Clayton. Thus, defendant Clayton would be risking his livelihood by voting against defendant Ergen. Accordingly, defendant Clayton lacks the adequate independence necessary to prosecute a suit against defendant Ergen, rendering any demand upon defendant Clayton futile.

78.     Defendant Moskowitz is not independent of defendant Ergen because he also owes his livelihood to defendant Ergen.   In addition to serving on the Board, defendant

Moskowitz is employed by Dish as a Senior Advisor. Defendant Moskowitz was paid a salary and bonus totaling $250,000 for these advising services in 2012. The Company expects to continue defendant Moskowitz's employment as a Senior Advisor to Dish during 2013. Further demonstrating defendant Moskowitz's lack of independence from defendant Ergen, defendant Ergen selected defendant Moskowitz to serve as trustee for certain trusts established for the benefit of defendant Ergen's children. As such, defendant Moskowitz lacks the adequate independence necessary to prosecute a suit against defendant Ergen, rendering any demand upon defendant Moskowitz futile.

79.     Defendant Vogel is not independent of defendant Ergen because he also owes his livelihood to defendant Ergen. In addition to serving on the Board, defendant Vogel is employed by Dish as a Senior Advisor. Moreover, defendant Vogel has worked at defendant Ergen-controlled entities since at least 1994 when he was hired by defendant Ergen to serve as a Dish executive. In 1995, defendant Vogel was promoted to President. In 2005, after taking time off from Dish to work for Liberty Media Corporation and Charter Communications, defendant Vogel came back to Dish to serve as the Vice Chairman of the Board. In September 2006, defendant Vogel was once again appointed as the Company's President. From October 2007 until March 2009, defendant Vogel served as EchoStar's Vice Chairman and Senior Advisor. Defendant Vogel currently owns over $16 million worth of Dish Class A common stock. Accordingly, defendant Vogel lacks the adequate independence necessary to prosecute a suit against defendant Ergen, rendering any demand upon defendant Vogel futile.

80.     Defendant Ortolf is not independent of defendant Ergen because he has worked at defendant Ergen-controlled entities since at least 1988 when he was hired by defendant Ergen to serve as Dish's President and Chief Operating Officer. Defendant Ortolf resigned in 1991 and

came back to Dish in 2005 to serve as a director.  Defendant Ortolf also joined EchoStar's Board in 2007.  As such, defendant Ortolf lacks the adequate independence necessary to prosecute a suit against defendant Ergen, rendering any demand upon defendant Ortolf futile.

81.     Confirming these concerns regarding defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, and Vogel's ability to vigorously prosecute the claims alleged herein, Dish has disclosed in its SEC filings that defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, and Vogel are not considered independent directors under the listing standards of the NASDAQ Stock Exchange and rules promulgated by the SEC.

82.     For all the foregoing reasons, defendants Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, and Ortolf lack independence from defendant Ergen.  Demand is therefore excused as to defendants Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, and Ortolf.

> **C.     Demand Is Excused Because Defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, Goodbarn, and Ortolf Face a Substantial Likelihood of Liability for Their Misconduct**

83.     As members of the Audit Committee during the time of the wrongdoing, defendants Goodbarn and Ortolf had additional and heightened responsibility to oversee the Company's operations.  Moreover, the Audit Committee Defendants were responsible for implementing and maintaining an adequate system of internal controls to ensure the Company's compliance with applicable rules and regulations.  The Audit Committee Defendants breached their fiduciary duties of loyalty and good faith because they knowingly and recklessly failed to ensure such internal controls were in place as demonstrated by the self-serving transactions which occurred, and are occurring, under their watch.  Thus, defendants Goodbarn and Ortolf face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

84.     Additionally, the entire Board breached its duty of loyalty by causing the Company to top defendant Ergen's improper $2 billion offer to purchase LightSquared by $200 million.    Defendant Ergen should not have been allowed to compete with Dish for LightSquared's valuable spectrum assets in the first place.   Moreover, the Board should not have permitted defendant Ergen to set an unnecessary floor of $2 billion for LightSquared.   As explained above, defendant Ergen's involvement with LightSquared has jeopardized the Company's potential opportunity to acquire LightSquared and its spectrum assets.   Defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, Goodbarn, and Ortolf failed to implement adequate internal controls and procedures to avoid the self-dealing discussed herein. Accordingly, defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, Goodbarn, and Ortolf face a substantial likelihood of liability for their misconduct, rendering any demand upon them futile.

85.     Dish has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.   Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Dish any part of the damages Dish suffered and will suffer thereby.   The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the self-dealing alleged herein in the face of media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

86.     Plaintiff has not made any demand on the other shareholders of Dish to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)      Dish is a publicly held company with over 218 million shares outstanding and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## X.    COUNT I - AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

87.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.      Defendant Ergen breached his fiduciary duties by purchasing LightSquared's debt at discount and using his control over Dish and the Individual Defendants to cause the Company to acquire LightSquared and ensure that his investment is protected and that he earns a handsome profit.

89.      The Individual Defendants, as directors of Dish, are fiduciaries of the Company and its shareholders.  As such, they owe the Company the highest duties of loyalty, candor, and good faith and fair dealing.  The Individual Defendants, defendants Ergen, Clayton, DeFranco, C. Ergen, Moskowitz, Vogel, Goodbarn, and Ortolf, breached their fiduciary duties by: (i) blindly acquiescing to defendant Ergen's self-serving scheme to purchase LightSquared's debt at a discount; (ii) allowing defendant Ergen to set an unnecessary $2 billion floor for the value of LightSquared; and (iii) approving Dish's $2.2 billion offer to purchase LightSquared, thereby guaranteeing defendant Ergen a profit on his investment in LightSquared's debt.

90.     The Audit Committee Defendants, defendants Goodbarn and Ortolf, breached their fiduciary duties by failing to fairly to ensure that the Company had an adequate system of internal controls to monitor self-dealing.

91.     In contemplating, planning, and/or effecting the foregoing conduct, the Individual Defendants were not acting in good faith toward the Company and breached their fiduciary duties.

92.     As a result of these actions of the Individual Defendants, the Company has been and will be damaged.

## XI.     COUNT II - AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     As a result of the wrongdoing discussed above, the Individual Defendants have caused Dish to waste its assets by offering $200 million more to purchase LightSquared's assets than the Company would be required to offer but for defendant Ergen's improper competing offer.  Moreover, as result of defendant Ergen's misconduct, the Company now faces litigation and is alleged to have committed fraud as part of its efforts to acquire LightSquared.

95.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

96.     Plaintiff, on behalf of Dish, has no adequate remedy at law.

## XII.     COUNT III - AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     By their wrongful acts and omissions, the Individual Defendants were unjustly

- 30 -

enriched at the expense of and to the detriment of Dish. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Dish.

99.     Defendant Ergen received a windfall as result of the Company allowing him to purchase LightSquared's debt at a discount only to have the Company ensure his investment and guarantee that he makes a profit.

100.    Plaintiff, as a shareholder and representative of Dish, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

101.    Plaintiff, on behalf of Dish, has no adequate remedy at law.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Dish, demands judgment as follows:

A.      Ordering the disgorgement of any profits defendant Ergen has or will receive as a result of his improper purchase of LightSquared's debt;

B.      Restricting defendant Ergen from any further efforts to compete with Dish in its attempt to acquire LightSquared;

C.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Dish and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's

By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.       a proposal to strengthen the Company's controls over self-dealing through the creation of an independent committee tasked with the responsibility of supervising and approving related-party transactions;

2.       a provision to permit the shareholders of Dish to nominate at least three independent candidates for election to the Board;

3.       a provision to ensure that at least half the Board is independent of defendant Ergen; and

4.       a proposal to implement procedures for greater shareholder input into the policies and guidelines of the Board;

E.       Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' wrongdoing so as to assure that plaintiff on behalf of Dish has an effective remedy;

F.       Awarding to Dish restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.       Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.       Granting such other and further relief as the Court deems just and proper.

## XIV.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 25, 2013

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
GREGORY E. DEL GAIZO
MICHAEL J. NICOUD

s/Brian J. Robbins
BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com
mnicoud@robbinsarroyo.com

ROBEIN, URANN, SPENCER, PICARD &
CANGEMI APLC
MARIA CANGEMI
CHRISTINA CARROLL
2540 Severn Avenue, Suite 400
Metairie, LA  70002
Telephone: (504) 885-9994
Facsimile: (504) 885-9969

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Lane, Suite A
Cypress, TX  77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774

Attorneys for Plaintiff

897411

## VERIFICATION

I, _____, hereby declare as follows:

I am a Trustee for the Iron Workers Mid-South Pension Fund, plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____

_____
TRUSTEE